IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>BEATRIZ PRADO,<br><br>Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:11-cr-892 |

Defendant Beatriz Prado has moved to suppress all the evidence that was derived from her detention after a traffic stop and the subsequent search of the car that she was driving. Because the court agrees with Ms. Prado that the police unreasonably extended the length of her detention after an otherwise lawful traffic stop, the court GRANTS her motion to suppress (Dkt. No. 25).

BACKGROUND

On October 17, 2011, Ms. Prado was driving from Phoenix to the Salt Lake City area in a rented Dodge Avenger with her friend, Guadalupe Rojas-Soto.  Utah Highway Patrol Trooper Nicholas Berrie was on duty near Kanab, Utah, when he received a phone call from Trooper Gary Perea.  (Tr. of Evid. Hr'g, at 6, Apr. 25, 2012, Dkt. No. 27.)  Trooper Perea told Trooper Berrie to keep an eye out for a Dodge Avenger, which he described as a "vehicle of interest."  (Id.)

Shortly after midnight, Trooper Berrie saw the Dodge Avenger that Ms. Prado was driving and noticed that she slowed from 67 miles per hour to 55 miles per hour in a zone where

the speed limit was 65 miles per hour.  (Id. at 7.)  He began to follow Ms. Prado, who properly

signaled to turn off the highway but then failed to signal a left turn into a gas station

approximately 40 to 50 feet later.  (Id. at 17.)  As a result of Ms. Prado's failure to signal, which

occurred at 12:26 a.m., Trooper Berrie turned on his overhead lights and began a traffic stop.

(Id.)  A video of the stop shows that Trooper Berrie contacted dispatch with Ms. Prado's license

plate information and then got out of his car and walked to the passenger side of Ms. Prado's car.

(Video at 12:26.17-12:26.42, Gov't Ex. 1.)  After speaking briefly with Ms. Prado and Ms.

Rojas-Soto, he asked Ms. Prado to accompany him back to his patrol car.  (Id. at 12:28.50.)

After Trooper Berrie got back into his car with Ms. Prado, he called dispatch with

information about her license and registration.  (Id. at 12:29.22.)  He then asked Ms. Prado a

series of questions about the purpose of her trip, the passenger who was in her car, and the length

of time that she had stayed in Phoenix.  (Tr. of Video at 4-5, Ex. A to Def.'s Mem. Supp. Mot.

Suppress, Dkt. No. 35-1.)  At the evidentiary hearing, Trooper Berrie testified that Ms. Prado told

him that "she had gone down there for two days."  (Hr'g Tr. at 10.)  But after hearing the video,

the court concludes that Ms. Prado actually said that she and her friend Guadalupe had stayed in

Phoenix "Tuesday through Friday, Saturday and left Sunday coming back [to Utah]."  (Tr. of

Video at 6.)  She also told Trooper Berrie that the purpose of the trip was to help a friend move.

(Id. at 5.)

Roughly six minutes into the stop, dispatch gave the information that Trooper Berrie had

requested and told him that Ms. Prado had one previous arrest but that there were no outstanding

warrants for her.  (Video at 12:32.35.)  Ms. Prado then gave a long explanation to Trooper Berrie

concerning the arrest.  (Tr. of Video at 7-8.)

Ms. Prado gave Trooper Berrie a copy of the rental agreement for the car she was driving, and he noted that the agreement was for a Kia Forte and not a Dodge Avenger.  (Hr'g Tr. at 9.) He also saw that the car was three days overdue.  (Id.)  About twelve minutes into the stop, Trooper Berrie asked Ms. Prado why the rental agreement was for a Kia and not a Dodge. (Video at 12:38.20.)  She explained that she had hit a donkey on the way to Phoenix, although it is unclear how this accident relates to the inaccurate information in the rental agreement, since she said that she hit the donkey while driving the same car, that is, the Dodge Avenger.  (Tr. of Video at 9-10.)  It appears to the court that Ms. Prado was perhaps trying to tell the trooper that the first time she noticed the discrepancy was when someone at the store pointed it out to her.[1] (See id.)

Approximately sixteen minutes into the stop, Trooper Berrie left Ms. Prado in the patrol car and went to speak with Ms. Rojas-Soto.  (Video at 12:42.)  He asked Ms. Rojas-Soto for identification and then asked her a series of questions in which it was clear that Ms. Rojas-Soto had difficulties communicating in English:

OFFICER BERRIE: Where are you guys going?

PASSENGER: Where are we going?

OFFICER BERRIE: Yeah, where are you headed?  Where are you guys going to?

PASSENGER: Home.

OFFICER BERRIE: Where are you going?  Where is home?

PASSENGER: Phoenix?

---

[1]Ms. Prado's spoken English is sometimes difficult to follow, but it appears that she went to a store to fix something on the car that was broken as a result of the accident.

3

OFFICER BERRIE: Where in Salt Lake?  Salt Lake where?  West Valley?  Kearns?

PASSENGER: West Valley.

OFFICER BERRIE: Your I.D. is from Chicago.

PASSENGER: Yeah.

OFFICER BERRIE: Where are you coming from tonight?  Have you been down in Arizona?

PASSENGER: Yes?

OFFICER BERRIE: What part?  Where were you in Arizona?

PASSENGER: What part of Arizona?

OFFICER BERRIE: Yeah.

PASSENGER: (Inaudible) Arizona?

OFFICER BERRIE: Were you coming from Arizona?

PASSENGER: Yeah (inaudible).  I don't speak English.

(Tr. of Video at 12-13.)  At the evidentiary hearing, Trooper Berrie stated that there was a language barrier between him and Ms. Rojas-Soto.  (Hr'g Tr. at 34-35.)

In response to Trooper Berrie's question about why Ms. Rojas-Soto and Ms. Prado had gone to Phoenix, Ms. Rojas-Soto stated that the purpose of the trip was "to buy some makeup and to go shopping."  (Tr. of Video at 14.)  She also told Trooper Berrie that she and Ms. Prado had been in Phoenix for four days.  (Id.)  Trooper Berrie asked Ms. Rojas-Soto if she had been in an accident during the trip: "You guys didn't get in an accident or nothing like that?"  (Id. at 15.)  Ms. Rojas-Soto responded, "No, no accident?"  (Id.)

When Trooper Berrie returned to the patrol car, about twenty minutes into the stop, Ms.

4

Prado asked him if she was going to get a ticket.  He answered, "there is a very good chance of

that." (Video at 12:46.30.)  At the evidentiary hearing, Trooper Berrie testified that he still had

not made up his mind at that point whether he was going to issue Ms. Prado a ticket.  (Hr'g Tr. at

40.)  Trooper Berrie then asked dispatch to run a check on Ms. Rojas-Soto.  (Video at 12:47.45.)

A few minutes later, dispatch responded that Ms. Rojas-Soto did not have a record.  (Id. at

12:51.08.)

    Trooper Berrie then asked Ms. Prado if there was any alcohol in the car.  (Id. at

12:51.10.)  Ms. Prado replied that there were some wine coolers and offered to let him see them

to make sure they were closed.  (Id. at 12:51.52.)  Trooper Berrie asked if there were any drugs,

and Ms. Prado responded that there were not.  (Tr. of Video at 20-21.)  Trooper Berrie also asked

Ms. Prado if she had any marijuana, to which she responded, "You can look."  (Id. at 20.)

    During this conversation, and roughly twenty-seven minutes into the stop, a K-9 officer

named Deputy Smith arrived.  (Id. at 21; Govt's Supp. Mem., at 2, Dkt. No. 41.)  Trooper Berrie

asked Ms. Prado if the dog would indicate on anything in the car, and Ms. Prado responded that it

would not.  (Tr. of Video at 22.)  The following exchange took place:

> OFFICER BERRIE: Well, on this street here I'm going to have [the dog] run
> around the outside and inside of the car and double check everything and make
> sure that the wine coolers are sealed up, okay?
>
> Ms. Prado: Yeah, you can see the wine coolers and —
>
> OFFICER BERRIE: Okay.  And then the dog is not going to tell us about
> anything in the car, right?
>
> Ms. Prado:  No.  No.

(Id. at 21-22.)

After the dog ran around Ms. Prado's car and went inside the car, Deputy Smith told

Trooper Berrie that the dog had alerted.  The record does not show whether the alert occurred

inside or outside the car.  And because Deputy Smith did not testify at the evidentiary hearing,

the court has no information about the strength of the alert.  Trooper Berrie then searched Ms.

Prado's car and discovered narcotics inside.  (Hr'g Tr. at 13.)

ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend.

IV.  In order to evaluate whether Trooper Berrie's traffic stop violated Ms. Prado's Fourth

Amendment rights, the court must examine whether the interference caused by the stop was

reasonably limited in both scope and duration.  See Florida v. Royer, 460 U.S. 491, 500 (1983).

The court focuses its analysis on the question of whether Trooper Berrie impermissibly extended

the duration of his stop of Ms. Prado.

"[A]n investigative detention must be temporary and last no longer than is necessary to

effectuate the purpose of the stop."  Id.  Indeed, "a seizure that is lawful at its inception can

violate the Fourth Amendment if its manner of execution unreasonably infringes interests

protected by the Constitution."  Illinois v. Caballes, 543 U.S. 405, 407 (2005).  Further, a

"seizure that is justified solely by the interest in issuing a warning ticket to the driver can become

unlawful if it is prolonged beyond the time reasonably required to complete that mission."  Id. at

407.  For that reason, "the investigative methods employed should be the least intrusive means

reasonably available to verify or dispel the officer's suspicion in a short period of time."  Royer,

460 U.S. at 500.  The government has the burden "to demonstrate that the seizure it seeks to

6

justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to
satisfy the conditions of an investigative seizure." Id.

The government has not met its burden here. Trooper Berrie stopped Ms. Prado for her
failure to signal, a minor traffic violation. And yet he testified that twenty minutes into the stop,
he was still unsure whether he was going to give Ms. Prado a ticket. (Tr. at 40.) After
determining that neither Ms. Prado nor her passenger had any outstanding warrants, there was no
reason for Trooper Berrie to detain Ms. Prado further. The government's "general interest in
criminal investigation, without more, is generally insufficient to outweigh the individual interest
in ending the detention." United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc).

The government claims that Trooper Berrie had reasonable suspicion to continue the
search for a number of reasons. First, the government cites the inconsistencies between Ms.
Prado and Ms. Rojas-Soto's description of the purpose of the trip. Ms. Prado stated that the two
were traveling to Phoenix to help a friend move, while Ms. Rojas-Soto said that they had gone to
shop and buy makeup. But these two statements are not inconsistent, especially because of the
evident language communication difficulties between Trooper Berrie and Ms. Rojas-Soto.
Reading the transcript of the video, it is clear the Ms. Rojas-Soto did not understand many of
Trooper Berrie's questions and that she responded with a limited vocabulary. Her failure to
mention a friend's move does not constitute reasonable suspicion. Similarly, there was no
discrepancy about the length of the trip. Even if Trooper Berrie understood that Ms. Prado said
"two days" instead of "Tuesday" (Tr. at 10), he did not pursue this line of questioning with Ms.
Prado after hearing Ms. Rojas-Soto tell him that the two had been in Phoenix for four days. And
Ms. Rojas-Soto's equivocal statement "No, no accident?" (Tr. of Video at 15) in response to

7

Trooper Berrie's question about the donkey incident is insufficient to conclude that she was contradicting Ms. Prado's story.  Given the language barrier, these small inconsistencies do not amount to reasonable suspicion of criminal activity.

In addition, the government argues that Trooper Berrie had reasonable suspicion because Ms. Prado was reluctant to identify Ms. Rojas-Soto.  But Ms. Prado's response of "Oh, yeah" to Trooper Berrie's question, "Who is the young lady in the car with you?" suggests that she simply did not understand the question that Trooper Berrie was asking.  (Tr. of Video at 5-6.)  At any rate, the short amount of time it took Ms. Prado to ultimately identify her friend does not seem unreasonable.  (See Tr. of Video at 5-6.)  And Trooper Berrie was able to allay those suspicions by running Ms. Rojas-Soto's information and determining that she had no outstanding warrants.

The government also points to Ms. Prado's lengthy descriptions of the withdrawn arrest warrant and the accident with the donkey.  But while her stories are somewhat difficult to follow, there is nothing manifestly untrue about them and her talkativeness alone is not indicative of criminal activity.

Finally, the government claims that Trooper Berrie prolonged the stop because of his concerns about the car that Ms. Prado was driving.  The car was three days overdue on the rental agreement and a Dodge Avenger was not the car listed on the paperwork.  But in United States v. Santos, 403 F.3d 1120 (10th Cir. 2005), the Tenth Circuit dismissed the notion that recently expired rental agreements suffice for reasonable suspicion.  As the court noted, "[c]ommon experience suggests that it is not unusual for a driver to rent a car for a certain period, and then to extend the rental without incurring a penalty or paying a higher rate."  Id. at 1129.  In Santos, the court pointed out that the officer "noticed the return date on the rental agreement but did not

8

discuss its implications with Mr. Santos." Id. at 1130.  Here, Trooper Berrie failed to press Ms. Prado on the details concerning the rental.  And the information from dispatch revealed no concerns that the Dodge Avenger was stolen.  It is unlikely that Trooper Berrie could have called the rental car company at that late hour, but he could have pursued his investigation of the discrepancy by asking Ms. Prado for additional information about the rental.  At any rate, the fact that the rental agreement was for a Kia Forte instead of a Dodge Avenger is not suspicious enough to justify Trooper Berrie's questions about alcohol and drugs, which occurred twenty-five minutes into the search after information from dispatch had cleared both Ms. Prado and Ms. Rojas-Soto of any outstanding warrants.

Given that Trooper Berrie called the K-9 unit before he even began the traffic stop (see Govt's Supplemental Mem., at 2, Dkt. No. 41), it is likely that he had a desire to investigate the presence of drugs in Ms. Prado's car.  But the court must analyze the scope of his search on the basis of the stop alone, a failure to signal.  Trooper Berrie impermissibly prolonged Ms. Prado's detention because he did not diligently address the initial purpose of the stop and the detention was not reasonably related in duration to the underlying circumstances.  As a result, the search violated Ms. Prado's Fourth Amendment rights.

Because Trooper Berrie's questions to Ms. Prado concerning alcohol and drugs occurred after the stop had become an illegal detention, the court need not determine the scope of Ms. Prado's consent to search that she may have given in her answers to those questions.  There is also no need for the court to address whether, if Ms. Prado only gave consent for a dog seach outside her car, the government has shown that the dog's alert occurred outside of Ms. Prado's vehicle.

Since Trooper Berrie effectively abandoned the purpose of the stop and conducted an investigation unsupported by reasonable suspicion, the drugs that were ultimately seized from the search must be suppressed.

ORDER

Based on the reasons set forth above, Ms. Prado's Motion to Suppress (Dkt. No. 25) is GRANTED.

SO ORDERED this 28th day of August, 2012.

BY THE COURT:

_Tena Campbell_
TENA CAMPBELL
U.S. District Court Judge